**\*NOT FOR PUBLICATION\***

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| KELLY HOUSTON, | : | Civ. Action No.: 13-4461(FLW) |
| Plaintiff, | : | |
| v. | : | |
| | : | OPINION |
| DIALYSIS CLINIC, INC., d/b/a DCI and RHONDA BICHARD, | : | |
| Defendants. | : | |

WOLFSON, District Judge:

Plaintiff Kelly Houston ("Plaintiff" or "Houston"), a registered nurse, was employed by Defendants Dialysis Clinic, Inc. ("DCI") from February 2013 until June 2013, at which time she was allegedly terminated for poor job performance, a decision made in part by her manager, defendant Rhonda Bichard ("Bichard").[1]  Plaintiff instituted this suit against Defendants, alleging that her termination was based upon race and disability discrimination, and retaliation for engaging in protected employment activity, in violation of 42 U.S.C.S. § 1981 and New Jersey Law Against Discrimination ("NJLAD").  In the instant matter, Defendants move for summary judgment on all claims.  For the reasons set forth herein, the Court **GRANTS** Defendants' motion in its entirety.

---

[1]     DCI and Bichard will be collectively refer to as "Defendants."

## BACKGROUND

The following facts are undisputed unless otherwise noted.  Houston was a hired as a staff nurse at DCI's North Brunswick dialysis clinic commencing on February 18, 2013, and terminated on June 19, 2013.  Defendants' Statement of Undisputed Fact ("Def. Statements"), ¶ 1.  During the entire four months of employment, Houston was in her probationary period.  *See* Pl. Dep., pp. 23-24, 30-32. Upon her hiring, Houston was supervised by Lois LaManna, who was the clinic manager, and other charge nurses, including, Bichard and Noreen Rick.  Plaintiff's Statement of Undisputed Fact ("Pl. Statements"), ¶ 7.  In June 2013, Bichard became the clinic manager and continued to supervise Houston. As a manager, Bichard reported to Katchy Bivens, DCI's director of nursing.  *Id.* at ¶ 8.  Because of her supervisory role, Bichard had the authority to issue verbal and written discipline to nurses, as well as to recommend an employee's termination.  *Id.* at ¶¶ 10-11.

DCI is a nonprofit health care company that provides dialysis treatment to patients with diseases that impede kidney function.  Def. Statements, ¶ 4.  Nurses at DCI, including Houston, assist the dialysis process, which cleanses a patient's blood through use of a machine, also known as a dialyzer.  *See Id.* at ¶ 5.  Because the dialyzer is in contact with the patient's blood, the risk of infections is significant; as such, DCI requires its nurses to wear personal protective equipment, such as gloves, for prevention purposes.  *Id.* at ¶ 8.

On or about April 8, 2013, when Houston was first scheduled to work without a preceptor, Houston cleaned a dialysis machine improperly.  *See* Pl. Dep., pp. 96-97.

According to Plaintiff, this incident was merely a learning "situation," and indeed, Houston was not disciplined for this infraction. *Id.* Additionally, on May 25, 2013, Rick reported in an email to Bichard and LaManna that Rick had a conflict with Houston and a Patient Care Technician ("PCT"), Herby Vilus, when Rick confronted them over their failure to properly sanitize the dialysis machines after patient treatments. *See* Rick Dep., pp. 15-17. DCI did not discipline Houston or Vilus at that time, beyond the informal, verbal correction from Rick. Def. Statement, ¶ 12. As to this incident, Houston testified that she does not remember that it occurred. *See* Pl. Dep., p. 97.

On June 13, 2013, Bichard received reports that Houston had begun a patient's treatment without properly verifying the correct dialyzer. Def. Statements, ¶ 13; *see* Pl. Statements, ¶ 51. According to Bichard, when she approached the patient area to investigate, she saw Houston cannulating a patient (i.e., beginning treatment of dialysis by placing a heavy needle into the patient's fistula) without wearing protective gloves, which violated DCI's safety protocols. Def. Statements, ¶ 14. Bichard testified that when she instructed Houston to use her gloves, Houston placed her "ungloved hand" in a box of gloves without first washing her hands. *Id.* While Plaintiff does not dispute that she failed to properly verify the dialyzer, *see* Pl. Dep, pp. 50-51, Houston testified that she did not remember that Bichard approached her regarding the failure to use gloves. *Id.* at p. 54 ("I don't remember that happening."). According to Defendants, both were serious infractions that violated DCI's policy. Def. Statement, ¶ 15.

3

Thereafter, on the same day, Bichard met with Houston to issue Houston a written warning for the violations and, at the same time, suspended Houston for one day, and extended Houston's probationary period for an additional 90 days, along with the implementation of a Plan of Correction. *Id.* at ¶ 18   According to Bichard, she consulted with her boss, Bivens and Susan Davis, the corporate Associate Director of Human Resources, for guidance as to how to address the violations and the proper level of discipline. *Id.* at ¶ 17. Bichard scheduled to meet with Houston on June 17, 2013, regarding the Plan of Correction. *See Id.* at ¶ 19. However, prior to that meeting, Houston emailed a written complaint to Bichard and Dan Wattson, DCI's Human Resources Director, stating that she believed the disciplinary action taken by Bichard – the written warning and the subsequent suspension – were racially motivated. *Id.*; *see* Pl. Dep., pp. 77-78. In her email, Houston based her belief on two assertions: (1) that she was being disciplined for failing to adhere to dialyzer protocols when two Caucasian nurses had not been disciplined after a similar incident; and (2) that, while she enjoyed her job, Rick had made derogatory and condescending remarks to her on the clinic floor in front of patients and staff, which Houston believed were directed exclusively toward African-American staff members. Def. Statements, ¶ 20; Pl. Response to Def. Statements ("Pl. Res."), ¶ 20. Notwithstanding Houston's email, DCI proceeded with its planned suspension and other corrective actions. Def. Statements, ¶ 21.

On June 17, 2013, Bichard met with Houston with respect to the one-day suspension, and warned Houston that any subsequent violation of DCI policy and

procedure would result in termination of employment.[2]  *Id.* at ¶ 22; Pl. Res., ¶ 22.  On June 19, 2013, Plaintiff did not report to work.  Def. Statement, ¶ 23.  According to Defendants, Houston was considered a "no-call/no-show" because Houston failed to call work at any time before the start of her shift (5:30 a.m.) to inform her supervisor that she would be absent.  *See* Bichard Dep., pp. 63, 197, 229.  DCI considered such an infraction a serious violation of policy because missing work for a staff nurse placed a significant burden on the clinic and could cause delays in patient treatment.  *See* Def. Statement, ¶ 24; Pl. Res., ¶ 24 ("Ms. Houston admits that failing to follow proper call out procedures and/or being a no-call/no show can cause delays in treatment . . . .").  Bichard testified that a charge nurse called Houston at 5:47 a.m., but Houston did not answer; Bichard personally reached out to Houston at 7:39 a.m., well after Houston's shift started.  According to Bichard, Houston advised Bichard that she was unaware that she was scheduled to work that day, was not around, and would have to get back in touch; Bichard testified that Houston hurried off the telephone call.  Bichard Dep., pp. 203-204, 213.  However, according to Houston, she repeatedly attempted to contact her supervisors between 5:30 a.m. and 7:00 a.m., via her cell and home phones, to inform DCI's personnel that she was experiencing severe panic attacks, a chronic disorder.  Pl. Statement, ¶ 82.  Houston's attempts were unsuccessful because, according to Houston, her calls went directly to DCI's message

---

[2]      On June 18, 2013, Houston worked a full shift; however, staff members complained to Bichard that Houston was uncommunicative.  Bichard Dep., pp. 103-04.  When Bichard spoke to Houston regarding the complaints, Houston blamed other employees for being verbally "abusive" because of her race.  *See* Pl. Dep., pp. 68-69, 72-73.

center as no one was working.[3]  *See Id.* at ¶ 88.

At 8:02 a.m., on the same day, Houston sent an email to Bichard explaining that Houston would not be coming to work, was not feeling well, was "scheduled for serious tests today" and would be bringing a doctor's note later.  *See* Pl. Dep., pp. 44, 47; Pl. Res., ¶ 28.  Importantly, Houston's email did not mention that she was experiencing panic attacks or that she had called the clinic before receiving Bichard's call at 7:39 a.m.  *See* Pl. Dep., p. 44.  After receiving Houston's email, Bichard consulted with Denis Redman, Human Resource personnel, to seek guidance on whether she could terminate Houston's employment based on the call-out policy and other performance violations.   *See* Bichard Dep., pp. 213-15.   Redman advised Bichard to inform Houston not to come to work the next day, and to contact Redman if Houston had any questions.  *See* Redman Dep., pp. 73-74.  Redman further sought approval from Dan Watson, DCI's Human Resource Director, to terminate Houston's employment, *see Id.* at pp. 61-62. Watson approved the termination based on a review of Houston's disciplinary history.  *See* Watson Dep., pp. 14, 18-19, 23.  In a call later that same day - June 19, 2013 – Houston contacted Redman and admitted that she was not sure whether she was scheduled to work that day.   *See* Pl. Res. To Defs' Request for Admissions; Redman Dep., p. 79; Pl. Resp., ¶ 33 (admitted that Houston was not sure whether she was scheduled to work on June 19, 2013).

---

[3]      Defendants claim that Houston did not make any calls to DCI on the morning of June 19, 2013, because both the telephone records of the clinic and Houston's personal cell phone do not reflect any calls made by Houston to the clinic prior to the start of Houston's shift or at any time before Bichard contacted Houston.  *See* Def. Statements, ¶¶ 26-28.

Because of her termination, Plaintiff brought this discrimination suit against Defendants.  In her two-count Complaint, Plaintiff asserts a cause of action under § 1981 against DCI and Bichard for race discrimination and retaliation.  Compl., ¶¶ 27-30.  In Count Two, Plaintiff accuses both defendants of race and disability discrimination, as well as retaliation, in violation of the NJLAD.  Defendants move for summary judgment on these claims.

## DISCUSSION

### I.   Standard of Review

A moving party is entitled to judgment as a matter of law where there is no genuine issue as to any material fact. *See* Fed R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)); *Brooks v. Kyler*, 204 F.3d 102, 105 n.5 (3d Cir. 2000) (citing Fed. R. Civ. P. 56(c)). The burden of demonstrating the absence of a genuine issue of material fact falls on the moving party. *See Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 305 (3d Cir. 1999). Once the moving party has satisfied this initial burden, the opposing party must identify "specific facts which demonstrate that there exists a genuine issue for trial." *Orson, Inc. v. Miramax Film Corp.*, 79 F.3d 1358, 1366 (3d Cir. 1996).

Not every issue of fact will be sufficient to defeat a motion for summary judgment; issues of fact are genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Further, the nonmoving party cannot rest upon mere allegations; he must present actual evidence that creates a genuine issue of material

fact. *See* Fed R. Civ. P. 56(e); *Anderson*, 477 U.S. at 249. In conducting a review of the facts, the non-moving party is entitled to all reasonable inferences and the record is construed in the light most favorable to that party. *See Pollock v. Am. Tel. & Tel. Long Lines*, 794 F.2d 860, 864 (3d Cir. 1986). Accordingly, it is not the court's role to make findings of fact, but to analyze the facts presented and determine if a reasonable jury could return a verdict for the nonmoving party. *See Brooks*, 204 F.3d at 105 n.5 (citing *Anderson*, 477 U.S. at 249).

## II.    § 1981 and NJLAD– Race Discrimination

### A.  *Prima Facie Case*

Discrimination claims brought under § 1981[4] and the NJLAD are analyzed according to the burden-shifting framework set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and later clarified in *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981) and *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1993). *Davis v. City of Newark*, 285 Fed. Appx. 899, 903 (3d Cir. 2010); *see Schurr v. Resorts Int'l Hotel, Inc.*, 196 F.3d 486, 498 (3d Cir. 1999) ("Analysis of a claim made pursuant to the NJLAD generally follows analysis of a Title VII claim"); *Bergen Commercial Bank v. Sisler*, 157 N.J. 188, 194 (1999)

---

[4]    Title VII and § 1981 both provide private remedies for racial discrimination by private employers in employment decisions and practices. *See Young v. International Telephone & Telegraph Co.*, 438 F.2d 757 (3d Cir. 1971).  In that regard, "[t]he elements of a § 1981 claim are identical to the elements of a Title VII employment discrimination claim." *McCarty v. Marple Twp. Ambulance Corps*, 869 F. Supp. 2d 638, 643 n.3 (E.D. Pa. 2012) (citing *Brown v. J. Kaz, Inc.*, 581 F.3d 175, 181-82 (3d Cir. 2009)). Thus, Plaintiff's § 1981 claims will be analyzed under Title VII jurisprudence.

(citations omitted) (finding that a claim of employment discrimination under Title VII, Section 1981 or NJLAD be analyzed under the same standard).

To establish a *prima facie* case of discrimination, the plaintiff must prove that (1) she belongs to a protected class; (2) that she was qualified for the position; (3) that she suffered an adverse employment action; (4) and the adverse action occurred under circumstances that give rise to an inference of discrimination. *Davis*, 285 Fed. Appx. at 903; *Jones v. Sch. Dist. of Philadelphia*, 198 F.3d 403, 410-12 (3d Cir. 1999); *see Burdine*, 450 U.S. at 253-54 & n. 6, *McDonnell Douglas*, 411 U.S. at 802.  In order to establish to a claim of racial discrimination, an adverse employment action must be "sufficiently severe as to alter the employee's 'compensation, terms, conditions, or privileges of employment,' or to 'deprive or tend to deprive [him or her] of employment opportunities or otherwise adversely affect his [or her] status as an employee.'" *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1296-97 (3d Cir. 1997), *abrogated on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006) (quoting 42 U.S.C. § 2000e-2(a)(1) and (2)).   Not every "insult, slight, or unpleasantness gives rise to a valid Title VII claim." *Id.* at 1297.

As to the third factor, an inference of discrimination could be supported in a number of ways, including, but not limited to, comparator evidence, evidence of similar racial discrimination of other employees, or direct evidence of discrimination from statements or actions by supervisors suggesting racial animus. *See Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511-12 (2002); *Golod v. Bank of Am. Corp.*, 403 Fed. Appx. 699, 703 n. 2 (3d Cir. 2010).  More specifically, when presenting

comparator evidence, on summary judgment, a plaintiff must prove that she is "similarly situated" to her comparators and that these employees have been treated differently or favorably by their employer. *See Williams v. Morton*, 343 F.3d 212, 221 (3d Cir. 2003); *Andy v. UPS*, 2003 U.S. Dist. LEXIS 25193, at *33 (E.D. Pa. Oct. 28, 2003); *Simpson v. Kay Jewelers*, 142 F.3d 639, 645 (3d Cir. 1998)). Significantly, "[s]imilarly situated" means "similar 'in all relevant respects.'" *Id.* (quoting *Singh v. Wal-Mart Stores, Inc.*, 1999 U.S. Dist. LEXIS 8531, at *19 (E.D. Pa. June 10, 1999)); *see Kline v. Kansas City, Mo., Fire Dept.*, 175 F.3d 660, 670-71 (8th Cir. 1999); *see also Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998) (plaintiff must show he was "similar in all of the relevant aspects" to persons allegedly receiving preferential treatment); *Holifield v. Reno*, 115 F.3d 1555, 1563 (11th Cir. 1997)("in all aspects"); *Shumway v. United Parcel Service*, 118 F.3d 60, 64 (2d Cir. 1997) ("similarly situated in all material respects"); *Dartmouth Review v. Dartmouth College*, 889 F.2d 13, 19 (1st Cir. 1989) ("in all relevant aspects"). This includes similarities between the requirements, duties and responsibilities of the respective jobs, but also similarity of the conduct (or misconduct) in which each employee engaged. *Dill v. Runyon*, 1997 U.S. Dist. LEXIS 4355, at *12 (E.D. Pa. 1997) ("To be deemed 'similarly situated,' the individuals with whom a plaintiff seeks to be compared must 'have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.") (quoting *Anderson v. Haverford College*, 868 F. Supp. 741, 745 (E.D. Pa. 1994)); *Williams v. Bala Ret. & Nursing Ctr.*, 2007 U.S. Dist. LEXIS

64593, at *12-13 (E.D. Pa. Aug. 31, 2007).

In sum, in order to raise an inference of discrimination based on comparator evidence, a plaintiff must demonstrate that: (1) the acts of the similarly situated employees were of a "comparable seriousness," *McDonnell Douglas*, 411 U.S. at 804; and (2) the employment decision must have been made by the same supervisors. *Taylor v. Procter & Gamble Dover Wipes*, 184 F. Supp. 2d 402, 410 (D. Del. 2002), aff'd, 53 Fed. Appx. 649 (3d Cir. 2002); *Taylor v. Div. of State Police*, 2004 U.S. Dist. LEXIS 11121, at *14 (D. Del. Jun. 15, 2004).

In this case, I note at the outset that Defendants do not challenge the sufficiency of Plaintiff's evidence with respect to the first three factors; that is, 1) Plaintiff is a member of a protected class (African American); 2) Plaintiff was qualified as a nurse; and 3) Plaintiff suffered an adverse employment action because she was terminated by Defendants in June 2013. Instead, Defendants center their argument on whether Plaintiff has sufficiently established the last factor of her *prima facie* case – an inference of racial discrimination. Indeed, Defendants contend that Plaintiff has not raised a genuine issue of material fact that her disciplinary actions -- i.e., warning, suspension and termination – were racially motivated. In response, Plaintiff submits that she was disciplined by Defendants more harshly than her white counterparts who engaged in the same or similar conduct. In that regard, Plaintiff attempts to establish an inference of discrimination through purportedly favorable

treatment of similarly situated employees,[5] which include: Mary Norris, Susie Kwok, Stephanie Rotundo, Susan Hairston, Natalie Baskina, Noreen Rick, Mary O'Connor, Herby Vilus, and Crystal Garvin.  However, I do not find that Plaintiff has met her burden of showing that these employees were similarly situated, and thus fails to establish a *prima facie* case of discrimination.  I will turn to each of these employees.[6]

First, Plaintiff points to Mary Norris, a Caucasian nurse who worked in the North Brunswick location. *See* Pl. Dep., p. 55.  According to Plaintiff, Norris was employed by DCI at the same time as Plaintiff, and therefore, Norris reported to both LaManna and Bichard.  *Id.* at p. 57.  According to her employment record, Norris was disciplined for violating Defendants' safety policies and procedures five times from May 2013 to September 2013.  Most of these infractions, however, were not similar in nature to Plaintiff's violations.  For example, in August 2013, Norris was issued a written warning because she failed to record results of pH meter readings; management warned Norris that she must comply with DCI's documentation policy. *See* Norris' Written Warning dated August 21, 2013.  In September 2013, because

---

[5]     Notably, to demonstrate an inference of discrimination, Plaintiff relies solely on comparator evidence; in that regard, Plaintiff has not proffered any evidence of direct discrimination or other similar acts of racial discrimination by Defendants. *See Golod*, 403 Fed. Appx. at 703 n.2.

[6]     Plaintiff argues that the determination of whether individuals are apt comparators is a jury question.  However, a court may properly grant summary judgment where no reasonable jury could find the individuals are similarly situated. *See McDonald v. Village of Winnetka*, 371 F.3d 992,1002 (7th Cir. 2004); *Red v. Potter*, 211 Fed. Appx. 82, 84 (3d Cir. 2006).

Norris committed the same infraction, she was suspended.[7]  *See* Norris' Suspension dated September, 3, 2013.  In fact, Norris was suspended twice in a five-month period. *See* Norris' Suspension dated July 2, 2013.  While Plaintiff argues that one of the infractions committed by Norris was failing to follow certain dialyzer procedures – similar to Plaintiff's infraction – Norris was disciplined by Bichard.  Contrary to Plaintiff's assertion, Norris was treated no differently than Plaintiff during her employment; Norris was warned verbally and by writing multiple times, which ultimately led to her suspensions.  More importantly, while Norris was not terminated, she was also never disciplined for committing a no call/no show,[8] the

---

[7]      Norris resigned following her suspension in September 2013.  *See* Def. Statement, ¶ 107.

[8]      As an ancillary matter, I address Plaintiff's argument that she was not a "no call/no show."  Plaintiff maintains that the proffered reason for her termination, i.e., no call/no show, was suspect. Houston insists that on June 19, 2013, she called DCI numerous times from her cell and home phones between 5:30 a.m. and 7:30 a.m., but no one was at work and the phone calls went to a "loop."  *See* Pl. Dep., p. 37, 39. Plaintiff claims that she was having a panic attack and therefore, could not have gone to work.  Eventually, however, Plaintiff asserts that she reached an unidentified employee and explained to that employee that she could not come to work due to a medical condition.  *See* Pl. Dep., p. 39. Defendants strenuously dispute Plaintiff's self-serving statements in this regard.  Indeed, both the phone records of DCI and Plaintiff's cell phone reveal that Plaintiff never called DCI.  *See* Def. Response to Pl. Counter-Statement of Material Facts, ¶ 83.  Rather, the first communication on the morning of June 19, 2013, was a phone call from Bichard to Plaintiff at 7:39 a.m. Even more damning, Plaintiff admitted to Bichard and Redman that she was not aware that she was scheduled to work on June 19, 2013.  Given that explanation, it is inconsistent for Plaintiff to testify that she purportedly called out of work, but yet admitted that she was unaware of her scheduled shift.  As such, because of Plaintiff's inconsistent statements and documentary evidence to the contrary, on a summary judgment motion, I need not credit Plaintiff's self-serving statements during her deposition; it is not sufficient to defeat summary judgment.  *See DeGroat v. Power Logistics*, 118 Fed. Appx. 575, 576 (3d Cir. 2004); *Coast Auto. Group, Ltd. v. VW Credit, Inc.*, 34 Fed. Appx. 818, 822 (3d Cir. 2002) ("inconsistent statements could not

primary reason why Plaintiff was terminated.   Therefore, based on her circumstances, I do not find that Norris was similarly situated to Plaintiff, because "the acts of the non-minority employee, [Norris], were [not] of a "comparable seriousness."  *McDonnell Douglas*, 411 U.S. at 804; *Livingston v. Borough of Edgewood*, 430 Fed. Appx.   172, 177 (3d Cir. 2011)(finding that similarly situated individuals are those "in circumstances of comparable seriousness"); *Opsatnik v. Norfolk Southern Corp.*, 335 Fed. Appx. 220, 223 (3d Cir. 2009) ("while similarly situated does not mean identically situated, purported comparators must have committed offenses of comparable seriousness." (citations and quotations omitted)).

Next, Plaintiff contends that Susie Kwok committed three violations of safety protocols, but was only issued three verbal warnings and she was not terminated. First and foremost, Kwok is not a similarly situated non-minority employee; she is a minority.  *See Johnson v. Diamond State Port Corp.*, 50 Fed. Appx. 554, 556 (3d Cir. 2002) ("Johnson had failed to establish a *prima facie* case of discrimination because he had not shown that similarly-situated *non-minority* employees received light duty." (emphasis added)); *Miller v. Del. Tech. & Cmty. College*, 2013 U.S. Dist. LEXIS 62113, at *47 (D. Del. May 1, 2013); *Diaz v. Donahoe*, 2013 U.S. Dist. LEXIS 1767, at *1-2 (D.N.J. Jan 4, 2013) ("[t]he key inquiries for the Court are whether Plaintiff has adduced admissible evidence from which the finder of fact could reasonably conclude

---

be used to create material issues of fact sufficient to preclude summary judgment."); *Kirleis v. Dickie, McCamey & Chilcote, P.C.*, 560 F.3d 156, 161 (3d Cir. 2009) ("Conclusory, self-serving [statements] are insufficient to withstand a motion for summary judgment.")(citations omitted).  *See also*, *infra*.

that she was treated differently from 'similarly situated' non-minority employees for her discrimination claims . . . .").  And, unlike Plaintiff, Kowk never committed a "no call/no show" infraction.  Therefore, based on these reasons, Kowk is not similarly situated to Plaintiff.

As an example of Defendants' favorable treatment of non-minorities regarding "no call/no shows," Plaintiff points to Stephanie Rotundo, who was a nurse working at the North Brunswick facility and supervised by Bichard.  Plaintiff cites to Rotundo's written discipline for not appearing at work for a scheduled shift.  *See* Rotundo's Written Warning dated January 30, 2014.  One important distinction, however, is that Rotundo was verbally warned for calling out of work to a charge nurse rather than her supervisor; she did, however, make this call well *prior* to her shift. This distinction is critical because Plaintiff was terminated for *not calling* and abandoning her shift.

Similarly, Plaintiff's comparison of her disciplinary actions to those of Susuan Hairston is inapt.  Hairston was verbally warned regarding a needle prick that Hairston herself sustained for failing to follow DCI's policy on safety as to the caregiver employee, not patient care.  Regardless, the requested inference based on Hairston's sole disciplinary action is not reasonable because, unlike Plaintiff, who committed three separate infractions, Bichard indicated that Hairston would be terminated if she were to commit another similar infraction.  *See Id.*  Likewise, Natalie Baskina is not similarly situated to Plaintiff because Baskina received counseling for only one infraction related to changing of gloves between patients,

rather than three separate ones, as Plaintiff received.  *See* Baskina's Verbal Warning dated June 26, 2012.

Finally, Rick stands on a different footing than Plaintiff because, while Rick was a nurse at the Clinic, she was also part of management as a charge nurse.  *See, e.g., Hanzer v. Mentor Network*, 2015 U.S. App. LEXIS 7350, at *7-8 (3d Cir. May 4, 2015)("the Program Manager position is an entirely different position than the Program Support Coordinator position. Thus, they were not similarly situated employees."); *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 170 (3d Cir. 2013) (observing that employees with higher levels of education and different positions are not similarly situated); *Ade v. Kidspeace Corp.*, 401 Fed Appx. 697, 705 (3d Cir. 2010) (finding that employees that hold different positions are not similarly situated).[9] More importantly, Plaintiff makes general assertions, without any evidence, that certain complaints were made against Rick and no disciplinary action was taken against Rick for those complaints.  Other than her conclusory accusations, Plaintiff does not identify when or by whom those complaints were made, nor does she describe those complaints; thus, no comparison can be drawn between Rick's alleged "issues" and those underlying Plaintiff's disciplinary action, such that they can be analyzed under the similarly situated prong for § 1981 purposes.

Having made those determinations, however, the Court recognizes that a few

---

[9]    Based on this line of reasoning, Plaintiff's attempt at comparing herself to Mary O'Connor, Herby Vilus and Crystal Garvin are not appropriate because, as Plaintiff concedes, these employees are patient care technicians and not nurses.  *See* Pl. Opposition Br. at p. 19.

of those employees, such as Baskina and Rotundo, have ostensibly committed violations of DCI's policy that are generally similar in nature to those committed by Plaintiff; thus, the question whether those nurses are appropriate comparators to Plaintiff is a closer call. That being said, I do not find that any of the co-workers Plaintiff identifies on this motion are similarly situated to Plaintiff under § 1981, because those employees have not committed a combination of violations, particularly the severe infraction of failing to call out of work, that would be sufficient to treat them as comparators and raise an inference of discrimination. Nonetheless, even assuming Plaintiff could establish a *prima facie* case of discrimination, she has failed to rebut Defendants' legitimate business reason for her termination.

      B.    *Burden Shifting*

If a plaintiff succeeds in establishing a *prima facie* case, the burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for the employee's termination. *Gerard v. Bridge Capital (USVI), LLC*, 282 Fed. Appx. 969, 972 (3d Cir. 2008). "The employer satisfies its burden of production by introducing evidence which . . . would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision." *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994). As the Third Circuit has noted, this burden is "relatively light" and "[t]he employer need not prove that the tendered reason actually motivated its behavior. . . ." *Id.*

If the employer is able to articulate such a reason, "the plaintiff must then show that the proffered reason was a pretext for a racially discriminatory decision."

*Id.* To show pretext, the plaintiff's evidence must either "(1) cast[] sufficient doubt upon each of the legitimate reasons proffered by the defendant so that a factfinder could reasonably conclude that each reason was a fabrication; or (2) allow[] the factfinder to infer that discrimination was more likely than not a motivating or determinative cause of the adverse employment action." *Fuentes*, 32 F.3d at 762; *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 198 (3d Cir. 2015). The plaintiff "cannot simply show that the employer's decision was wrong or mistaken" but rather "must demonstrate such 'weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered legitimate reason for its action that a reasonable factfinder could rationally find them unworthy of credence, and hence infer that the employer did not act for [the asserted] nondiscriminatory reasons.'" *Ross v. Gilhuly*, 755 F.3d 185, 194 n.13 (3d Cir. 2014) (alteration in original) (quoting *Brewer v. Quaker State Oil Ref. Corp.*, 72 F.3d 326, 331 (3d Cir. 1995)).

Here, as a legitimate business reason, Defendants proffer that Plaintiff committed serious infractions that supported Plaintiff's written warning, suspension and her eventual termination. To carry her burden, Plaintiff offers various reasons why Defendants' decision to discipline was pretextual. First, Plaintiff claims that Bichard exhibited antagonistic behavior after Plaintiff complained of race discrimination in emails sent to Bichard. Such behavior, Plaintiff explained, made her feel that her work environment had become "tense" and "angry." And, Plaintiff, without any evidence other than her own subjective impression, attributes that antagonism to her race. However, as the Third Circuit has clearly held, a plaintiff's

"subjective belief that race played a role in [her] employment decisions . . . is not sufficient to establish [pretext]." *Groeber v. Friedman & Schuman, P.C.*, 555 Fed. Appx. 133, 135 (3d Cir. 2014); *Tucker v. Thomas Jefferson Univ.*, 484 Fed. Appx. 710, 712 (3d Cir. 2012) ("the subjective belief that race played a part in his firing is insufficient."); *McDonnaugh v. Teva Specialty Pharms., LLC*, 2011 U.S. Dist. LEXIS 98638 at *16-17 (E.D. Pa. Aug. 31, 2011) (finding that plaintiff's "subjective belief that race played a role in an employment decision is insufficient to establish an inference of discrimination . . . ."). Simply stated, the fact that Plaintiff felt that management was hostile towards her because she complained of race discrimination cannot, alone, be a basis to find pretext.

Next, Plaintiff suggests that only after she complained about race discrimination, did Bichard suddenly subject Plaintiff to harsh disciplinary actions, i.e., written warning and suspension. In that connection, Plaintiff argues that a jury can find that this is evidence of pretext. Plaintiff's position is suspect for two reasons. First, as I have noted earlier in this Opinion, Plaintiff was suspended for failing to observe DCI's patient safety protocols, which Plaintiff, herself, identified as serious. *See* Pl. Dep., p. 54-55, 83. Therefore, the fact that Plaintiff was disciplined for those serious infractions undermines her argument that Bichard's decision to suspend her were somehow pretextual. *See, e.g., Barker v. Boeing Co.*, 21 F. Supp. 3d 417, 426 (E.D. Pa. 2014) ("under either a pretext or mixed-motive framework. Boeing fired the plaintiffs for what it deemed a serious act . . . ; there is no evidence that Boeing was motivated in any way by discriminatory animus." (internal quotations and citations

omitted)); *Ogilvie v. Northern Valley EMS, Inc.*, 2008 U.S. Dist. LEXIS 87913, at \*28-29 (E.D. Pa. Oct. 30, 2008) (rejecting plaintiff's argument of pretext when "Defendant has presented credible evidence that [plaintiff] committed a serious infraction."); *Taylor*, 2004 U.S. Dist. LEXIS 11121 at \*22 (finding no pretext when plaintiff's employment was terminated because of serious charges related to his abuse of the public trust).

Moreover, while Plaintiff was not formally disciplined, she was counseled by Defendants for safety violations on at least one occasion -- prior to Plaintiff submitting any complaints of racial discrimination. Indeed, Plaintiff acknowledged that she was instructed to clean the dialyzer differently because "we were doing something wrong." Pl. Dep., p. 96. While Rick had complained about a performance issue relating to Plaintiff in late May 2013, after Plaintiff had complained of racial discrimination, that complaint from Rick was never administratively pursued by Bichard, was not sent  for further review, and was not used as a basis for issuing discipline to Plaintiff. Therefore, no reasonable trier of fact can find that Bichard's decision to discipline Plaintiff for two serious safety infractions was based on a racial animus.

Lastly, Plaintiff argues that the fact that Defendants did not follow DCI's own progressive disciplinary policy is evidence of pretext. Viewing the facts in Plaintiff's favor, even if the Court were to assume that the disciplinary policy was not strictly followed, did occur, "'the mere fact that an employer failed to follow its own internal procedures does not necessarily suggest that the employer was motivated by illegal

discriminatory intent or that the substantive reasons given by the employer for its employment decision were pretextual.'" *Maull v. Div. of State Police*, 39 Fed. Appx. 769, 774 (3d Cir. 2010)(quoting *Randle v. City of Aurora*, 69 F.3d 441, 454 (10th Cir. 1995)).  Indeed, simply pointing to violations is inadequate without "evidence that white [nurses] were treated differently by Defendants with respect to these policies." *Id.* (quoting *English v. Colorado Department of Corrections*, 248 F.3d 1002, 1009 (10th Cir. 2001)) (noting that while "evidence that the defendant acted contrary to an unwritten policy or contrary to company practice" may show pretext, a plaintiff relying on such a violation must "provide evidence that [s]he was treated differently from other similarly-situated employees who violated work rules of comparable seriousness").

Here, it is not enough that Plaintiff accuses Defendants of failing to follow DCI policy, but rather, Plaintiff has to present sufficient evidence to show that other similarly situated white nurses in DCI were disciplined differently than Plaintiff such that it would raise an impermissible inference of discrimination and show pretext in the reasons given by Defendants for their actions.  But, as I have found, *supra*, Plaintiff has failed to establish that Defendants treated similarly situated white nurses more favorably.  Thus, without proof, "[Plaintiff] is left only with her subjective belief that race played a role in [Defendants'] employment decisions. She presents no discriminatory statements by [Defendants] or evidence of discriminatory motive to support her allegations."  *Groeber*, 555 Fed. Appx at 135; *Rodriguez v. AMTRAK*, 532 Fed. Appx. 152, 153 (3d Cir. 2013)("[a] plaintiff's subjective belief that

race played a role in an employment decision is not sufficient to establish an inference of discrimination. However, discrimination may be inferred by showing that the employer treated a similarly situated employee outside of the plaintiff's class more favorably.").[10]

Accordingly, I find that Plaintiff has failed to show there is any genuine issue of material fact that Defendants' proffered reasons for subjecting Plaintiff to disciplinary actions, including termination, were a pretext for a racially discriminatory purpose. Thus, summary judgment is granted in favor of DCI on Plaintiff's § 1981 and NJLAD discrimination claims.

C.   *Individual Liability*

As to Plaintiff's NJLAD claim against Bichard, because Plaintiff's claim for race discrimination against DCI, her employer, fails, there can be no claim for aiding and abetting by Bichard in violation of the NJLAD. *Ivan v. County of Middlesex*, 595

---

[10]    Plaintiff argues that Bichard acted suspiciously at the time of Plaintiff's termination by refusing to immediately inform upper management of Plaintiff's purported medical reason for missing her scheduled shift.  And, Plaintiff finds it suspect that Bichard asked Rick to forward a particular email regarding an infraction that Plaintiff had committed, but for which no investigation was undertaken. Plaintiff submits that Bichard's conduct in this regard is evidence of pretext. However, these assertions, couched as evidence, are merely Plaintiff's own speculations.   Indeed, these statements are conclusory and not sufficient to demonstrate pretext.  *See Kautz v. Met-Pro Corp.*, 412 F.3d 463, 471-73 (3d Cir. 2005 ); *Wolpert v. Albert Labs*, 817 F. Supp. 2d 424, 436 (D.N.J. 2011); *Malloy v. Intercall, Inc.*, 2010 U.S. Dist. LEXIS 136808, at *50 (D.N.J. 2010) (""Ms. Malloy has simply presented no evidence, beyond her speculation, that age played any role in the decisions leading up to her . . . termination."); *Boyd v. Citizens Bank of Pa., Inc.*, 2015 U.S. Dist. LEXIS 70210, at * 62 (W.D. Pa. 2014) ("Plaintiff does not, however, point to any evidence, beyond her own conclusory and speculative suspicions. . . "); *Connolly v. Mitsui O.S.K. Lines (Am.), Inc.*, 2009 U.S. Dist. LEXIS 86195, at *11-12 (D.N.J. 2009) ("Speculation, however, is not sufficient to demonstrate pretext.").

F. Supp. 2d 425, 463 (D.N.J. 2009) ("[F]or a defendant to be individually liable for aiding and abetting, the employer must also be liable under the LAD. It is not the act of discrimination but rather the failure in the employer's response that an aider and abettor is charged with assisting.").

To establish a § 1981 claim against Bichard individually, Plaintiff here, must show: (1) that she belongs to a racial minority; (2) an intent to discriminate on the basis of race on the part of the defendant; (3) discrimination concerning one or more of the activities enumerated in § 1981. *See e.g., Estate of Oliva v. New Jersey*, 604 F.3d 788, 797 (3d Cir. 2010). The Third Circuit has held that "[i]f individuals are personally involved in the discrimination against the [plaintiff], and if they intentionally caused [an infringement of rights protected by Section 1981], or if they authorized, directed, or participated in the alleged discriminatory conduct, they may be held liable." *Al-Khazraji v. Saint Francis Coll.*, 784 F.2d 505, 518 (3d Cir. 1986); *see also Johnson v. Res. for Human Dev., Inc.*, 843 F. Supp. 974, 978 (E.D. Pa. 1994); *Santiago v. City of Vineland*, 107 F. Supp. 2d 512, 541 (D.N.J. 2000).

However, as I have discussed at length, *supra*, Plaintiff has failed to present any genuine issue of material fact as to intentional discrimination on the part of DCI or Bichard. Thus, Bichard cannot be held individually liable under § 1981. *See Miller v. Thomas Jefferson Univ. Hosp.*, 908 F. Supp. 2d 639, 649 (E.D. Pa. 2012). According, Defendants' motion for summary judgment as to Plaintiff's race discrimination claims under both § 1981 and NJLAD is granted as to defendants DCI and Bichard.

III.   § 1981 and NJLAD – Retaliation

The Supreme Court has held that Section 1981 encompasses retaliation claims. *CBOCS W., Inc. v. Humphries*, 553 U.S. 442, 457 (2008).  To establish a *prima facie* claim for retaliation under § 1981, the plaintiff must prove three elements:

> (1) the employee engaged in a protected employee activity;
>
> (2) the employer took an adverse employment action after or contemporaneous with the employee's protected activity; and
>
> (3) a causal link exists between the employee's protected activity and the employer's adverse action.

*Andreoli v. Gates,* 482 F.3d 641, 649 (3d Cir. 2007); *Abramson v. William Paterson Coll. of N.J.*, 260 F.3d 265, 286 (3d Cir. 2001); *White v. Cleary*, 513 Fed. Appx. 224, 228 (3d Cir. 2013).  Retaliation claims raised under the NJLAD are analyzed under the same framework applicable to § 1981 cases, such that they may be considered together. *See Kant v. Seton Hall Univ.,* 289 Fed. Appx. 564, 567 (3d Cir. 2008); *Didler v. Dow Jones*, 2014 U.S. Dist. LEXIS 114289, *21 n.21 (D.N.J. Aug. 18, 2014).

If a plaintiff satisfies the first *McDonnell Douglas* requirement and establishes a *prima facie* case of retaliation, then an inference of discriminatory motive arises, shifting the burden to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment action.  *See Miller v. Del. Prob. & Parole*, 41 Fed. Appx. 581, 584 (3d Cir. 2002); *Krouse v. American Sterilizer Co.*, 126 F.3d 494, 500 (3d Cir. 1997).  "If the employer satisfies its burden, the plaintiff must be able to convince the factfinder both that the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action." *Krouse*, 126

F.3d at 500-01. "The plaintiff must prove that retaliatory animus played a role in the employer's decision-making process and that it had a determinative effect on the outcome of that process. The burden of proof remains at all times with the plaintiff." *Id.*

In this case, Plaintiff alleges that she was subjected to disciplinary actions by Defendants because she made verbal and written complaints of racial bias to management. Defendants have conceded that Plaintiff may establish a *prima facie* case of retaliation. Def. Brief in Support, p. 18. Indeed, Plaintiff claims that her termination or other disciplinary actions were taken in retaliation for her complaints of race discrimination, and given the temporal proximity between Plaintiff's termination and her complaints, I find that Plaintiff has satisfied her burden of demonstrating a *prima facie* case of retaliation. As I have find herein, Defendants have articulated a legitimate non-discriminatory reasons for Plaintiff's termination. However, Plaintiff has failed to carry her burden of establishing pretext.

In proving pretext, Plaintiff relies on identical arguments made in support of her discrimination claims, *supra*, and I have rejected those contentions. See Pl. Opp. Br., pp. 17-19. Thus, I need not address them here, again. I will comment on one additional argument related to pretext that Plaintiff has advanced in the context of her retaliation claim. Plaintiff insists that because she was terminated within one day of her final complaint of racial bias, this "extremely close temporal proximity between her race discrimination complaints and her termination is unusually suggestive of retaliation and is persuasive evidence of pretext." Pl. Opp. Br., p. 17.

As I have explained above, on June 18, 2013, Plaintiff verbally complained to Bichard regarding how LaManna "yelled at her" on the floor in front of other employees and patients. Moreover, Plaintiff expressed that she was subjected to this type of treatment because of her race. One day later, Plaintiff was terminated.

I do not find Plaintiff's position convincing. Plaintiff's argument is based on a temporal proximity of the day between her final complaint to Bichard and her termination. However, "inferring a causal relationship between the protected activity and the adverse action is not logical when the two are separated by an intervening event that independently . . . caused the adverse action." *Mizusawa v. United States Dep't of Labor*, 524 Fed. Appx. 443, 448 (10th Cir. 2013); *see Robinson v. Southeastern Pa. Transp. Auth.*, 982 F.2d 892, 894 (3d Cir. 1993); *Kachmar v. Sungard Data Sys.*, 109 F.3d 173, 179 (3d Cir. 1997); *Kuhn v. Washtenaw County*, 709 F.3d 612, 628 (6th Cir. 2013) ("an intervening legitimate reason to take an adverse employment action dispels an inference of retaliation based on temporal proximity." (citations and quotations omitted)); *Sanders v. Sailormen, Inc.*, 506 Fed. Appx. 303, 304 (5th Cir. 2013); *Coszalter v. City of Salem*, 320 F.3d 968, 977 (9th Cir. 2003) (finding that temporal proximity must be considered with regard to its factual setting, such as intervening events). Here, there was an intervening event that must be taken into consideration in determining whether the temporal proximity raised by Plaintiff is suggestive of pretext. Indeed, Plaintiff's no call/no show, which occurred on June 19, 2013 – the day of Plaintiff's termination – after other infractions, was the reason why she was terminated. In fact, Plaintiff had been warned by Bichard that if Plaintiff

were to commit another infraction, she would be terminated.  This event, thus, broke the causal link that could otherwise be inferred from temporal proximity.

Even if the intervening event had not occurred, Plaintiff cannot rely solely on temporal proximity to show pretext.  *See El Sayed v. Hilton Hotels Corp.*, 627 F.3d 931, 933 (2d Cir. 2010) (holding that while temporal proximity alone may be sufficient to satisfy a plaintiff's *prima facie* burden, that "temporal proximity is insufficient to satisfy [plaintiff's] burden to bring forward some evidence of pretext."); *Sanderson v. N.Y. State Elec. & Gas Corp.*, 560 Fed. Appx. 88, 94 (2d Cir. 2014) ("Apart from temporal proximity, Sanderson offers no evidence that NYSEG's reliance on her insubordination as the reason for her discharge was a pretext for retaliation. Accordingly, the district court also properly granted summary judgment on plaintiff's claim of retaliation."); *Carlson v. Township of Lower Alloways Creek*, 452 Fed. Appx. 95, 101-02 (3d Cir. 2011) (finding that mere temporal proximity, absent any evidence of retaliatory intent, is insufficient to demonstrate pretext); *Ritenour v. Tenn. Dep't of Human Servs.*, 497 Fed. Appx. 521, 533 n. 10 (6th Cir. 2012); *Pinkerton v. Colo. Dep't of Transp.*, 563 F.3d 1052, 1066 (10th Cir. 2009) (finding that temporal proximity alone is not sufficient to defeat summary judgment by showing that the employer's proffered reason is actually pretext for retaliation). Similarly, on the facts here, I find that Plaintiff has failed to show pretext.

Furthermore, as to retaliation claims against Bichard, as I have stated earlier, under § 1981, individuals including "directors, officers, and employees of a corporation may become personally liable when they intentionally cause an

infringement of rights protected by § 1981." *Al-Khazraji*, 784 F.2d at 518.  Individuals that "are personally involved in the discrimination," and intentionally caused, authorized, directed, or participated in the discriminatory conduct may be held liable. *Id.*  Similarly, the NJLAD's anti-retaliation provision deems it unlawful for "any person to take reprisals against any person because that person has opposed any practices or acts" that the NJLAD prohibits. N.J.S.A. 10:5-12(d); *see Hargrave v. Cnty. of Atl.*, 262 F.Supp. 2d 393, 436 (D.N.J. 2003) ("Thus, [the NJLAD anti-retaliation] provisions, like the provisions establishing liability for those employees who 'aid' and 'abet' an employer's unlawful employment practices, expressly contemplate direct liability for individual supervisory employees.").

Here, for the same reasons delineated above, I do not find that Plaintiff has raised any triable issue as to intentional discrimination on the part of Bichard to defeat summary judgment.  Accordingly, Plaintiff's retaliation claims against Bichard are dismissed.

## IV.   NJLAD – Disability Discrimination and Retaliation

The NJLAD prohibits employment discrimination based on a disability or a perceived disability. N.J. Stat. Ann. § 10:5-4.1; *see Victor v. State*, 203 N.J. 383, 410 (2010); *Myers v. AT & T*, 380 N.J. Super. 443, 452 (App. Div. 2005). In order to establish a *prima facie* case of discrimination under NJLAD, a plaintiff must prove that 1) she was a member of a protected class, 2) she was qualified for the job, 3) she was terminated, and 4) the position was filled with a person of similar qualifications. *See Viscik v. Fowler Equip. Co.*, 173 N.J. 1, 10 (2002); *Swiatek v. Bemis Co.*, 542 Fed.

Appx. 183, 186 (3d Cir. 2013).[11]  As a threshold question, a plaintiff must show that the employer knew of the disability. *Jones v. UPS*, 214 F.3d 402, 406 (3d Cir. 2000); *Geraci v. Moody-Tottrup, Int'l, Inc.*, 82 F.3d 578, 581 (3d Cir. 1996) ("the plaintiff must demonstrate that the defendant employer knew of the disability to state a *prima facie* case"); *Fulton v. Johnson & Johnson Pharm. Research & Development, LLC*, 2008 U.S. Dist. LEXIS 14163, at *58 (D.N.J. Feb. 26, 2008).

Here, Plaintiff maintains that she has been suffering from anxiety and panic attacks for several years.  In that regard, Plaintiff claims, albeit without any record evidence, that Defendants terminated her within hours of disclosing this medical condition.  However, assuming *arguendo* that Plaintiff has a disability,[12] Plaintiff's NJLAD claims fail because Plaintiff has not shown that Defendants had knowledge of her disability.

There is no dispute that prior to June 19, 2013, when Plaintiff failed to appear for her scheduled shift, Plaintiff never told Defendants the history of her anxiety or panic attacks while employed at DCI.  Indeed, Plaintiff conceded this point during her deposition:

---

[11]   "New Jersey courts generally interpret the LAD by reliance upon [the construction of] analogous federal antidiscrimination statutes." *Conchewski v. Camden County*, 2014 U.S. Dist. LEXIS 37130, at *36 (D.N.J. Mar. 21, 2014)(citations omitted).  Accordingly, it is appropriate to analyze an NJLAD disability discrimination claim by applying the 3-part test employed to analyze claims under the federal Americans with Disabilities Act. *See Lawrence v. Nat'l Westminster Bank N.J.*, 98 F.3d 61, 70 (3d Cir. 2006).

[12]   Importantly, I make no findings that Plaintiff's panic attacks and/or anxiety could qualify her as disabled under the NJLAD.

Q:    Before [June 19, 2013], had you told any manager at DCI that you had a history of anxiety and panic attacks?

A:    No, I did not, sure.

Q:    Had you ever missed work at DCI due to anxiety or panic attacks at DCI?

A:    No, sir.

Pl. Dep., p. 90. Rather, Plaintiff argues that she disclosed her conditions to Bichard over the phone in the morning of June 19, 2013, when Plaintiff explained her absence from work.

Notwithstanding Plaintiff's statement in this regard, none of the documentary evidence or other testimony corroborate Plaintiff's version of events. According to Bichard, Bichard called Plaintiff around 7:40 a.m. on the morning of June 19, 2013, to inquire why Plaintiff was not at her scheduled shift. Bichard Dep., p. 203. Bichard testified that Plaintiff told her that "she didn't know she was supposed to be at work . . . or she had forgotten and that was [a] mistake." *Id.* Importantly, Plaintiff informed Bichard that "she would have to get back to [Bichard]" regarding whether she would come to work later in the day, and Plaintiff did not mention that she was experiencing any medical issues. *Id.*, p. 203-04. Thereafter, Plaintiff sent an email to Bichard at 8:02 a.m., writing the following:

> I will not be coming to work today. I am not feeling well and I am scheduled for very serious tests today that I need to have. I will either bring a copy of my physician's note or fax it in stating when he will be releasing me to come back to work.

Houston Email dated June 19, 2014. Tellingly, Plaintiff did not indicate that she was

suffering from anxiety or panic attacks or any specific type of illness.  A general expression of "not feeling well" does not suffice to put an employer on notice that a plaintiff has a disability.  *See Jones v. Nationwide Life Ins. Co.*, 696 F.3d 78, 89-90 (1st Cir. 2012) ("NLI executives were not on notice that the symptoms Jones described in his e-mail were caused by a disability."); *King v. Permanente Med. Group, Inc.*, 2013 U.S. Dist. LEXIS 134388, at *22 (E.D. Cal. Sep. 19, 2013) ("And while knowledge of the disability can be inferred from the circumstances, knowledge will only be imputed to the employer when the fact of disability is the only reasonable interpretation of the known facts." (citations and quotations omitted)); *Conant     v. City of Hibbing*, 271 F.3d 782, 786 (8th Cir. 2006) (finding that an "employer's knowledge of impairment without more does not amount to a disability" (citations and quotation omitted)); *Aucutt v. Six Flags Over Mid-America*, 85 F.3d 1311, 1320 (8th Cir. 1996) (stating that "fact that [employer] was aware of [plaintiff's] medical problems is insufficient to establish that [employer] 'regarded' him as disabled.").

Further, Plaintiff sent another email on June 19, 2013, to Bichard.  In it, Plaintiff states that her "doctor's note [is] taking me out of work until June 26, 2013. He will re-evaluate me on June 26th to see if I am physically able to return and has informed me he will adjust the date according to my physical well-being."  Houston Email dated June 19, 2013.  Again, Plaintiff did not explain or inform Defendants that she had any specific disability, or worst yet, Plaintiff did not disclose any other pertinent facts from which one can regard Plaintiff as disabled.  Even more compellingly, Plaintiff's note from her doctor, attached to her email, only indicates

that Plaintiff was under a doctor's care at Capital Health from June 19, 2013 to June 26, 2013. *See* Doctor's Note dated June 19, 2013. Nowhere does the note mention any symptoms or disabilities.

Absent any evidence that Plaintiff put Defendants on notice of her alleged disability, i.e., suffering from panic attacks and anxiety, Plaintiff's own self-serving testimony during her deposition cannot defeat summary judgment, as no reasonable jury could find that Defendants were aware of Plaintiff's purported disability. *See Gonzalez v. Sec'y of Dep't of Homeland Sec.*, 678 F.3d 254, 263 (3d Cir. 2012) ("[C]onclusory, self-serving affidavits [and testimony] are insufficient to withstand a motion for summary judgment . . . . In this case, Gonzalez's own, sworn statements are insufficient to survive summary judgment."); *Irving v. Chester Water Auth.*, 439 Fed. Appx. 125, 127 (3d Cir. 2011)); *Jordan v. Cicchi*, 2014 WL 2009089, at *2 (D.N.J. May 16, 2014) ("the issue is not whether Plaintiff has relied solely on his own testimony to challenge [a summary judgment motion], but whether Plaintiff's testimony, when juxtaposed with the other evidence, is sufficient for a rational factfinder to credit Plaintiff's testimony, despite its self-serving nature."); *Johnson v. MetLife Bank, N.A.*, 883 F.Supp.2d 542, 549 (E.D. Pa. 2012); *Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of facts for the purposes of ruling on a motion for summary judgment."); *Irving v. Chester Water Auth.*, 439 F. App'x 125, 127 (3d Cir. 2011) (holding that "self-serving deposition testimony is insufficient to raise a

genuine issue of material fact."); *Synthes, Inc. v. Emerge Med., Inc.*, 25 F. Supp. 3d 617, 672 (E.D. Pa. 2014)(same); *Danois v. i3 Archive, Inc.*, 2013 U.S. Dist. LEXIS 98105, at *28-29 (E.D. Pa. Jul. 12, 2013) (finding that plaintiffs' reliance on their self-serving deposition testimony cannot create an issue of fact on summary judgment since "the Third Circuit has extended to deposition testimony the principle that conclusory, self-serving affidavits are insufficient to withstand a motion for summary judgment." (quotations and citations omitted)).

Accordingly, Plaintiff has failed to demonstrate a *prima facie* case of disability discrimination or retaliation; her claims under the NJLAD in this regard are dismissed as to both DCI and Bichard.

## CONCLUSION

For the reasons set forth above, Defendants' motion for summary judgment is **GRANTED**.

Dated: June 26, 2015                                    /s/          Freda L. Wolfson
                                                       Freda L. Wolfson
                                                       United States District Judge

33